UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>JUAN SOLANO,<br>                    Defendant. | **MEMORANDUM AND ORDER**<br>16-CR-535 (LDH) |

LASHANN DEARCY HALL, United States District Judge:

Defendant Juan Solano was tried and convicted in November 2017 of one count of attempted possession of cocaine with intent to distribute. (ECF No. 64.) He was ultimately sentenced to 42 months' imprisonment. (ECF No. 90.) On July 22, 2020, the Second Circuit vacated the conviction, concluding that the Court's application of the interested party jury instruction was plain error. *Unites States v. Solano*, 966 F.3d 184, 193 (2d Cir. 2020). The case was remanded to this Court for further proceedings. Defendant now moves pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3501, and the Fifth and Sixth Amendments of the United States Constitution, to suppress statements allegedly made by him to government agents after his arrest on June 7, 2016. (Def.'s Mot. Suppress, ECF No. 99.) The sole issue on this motion to suppress is whether Defendant received *Miranda* warnings and waived his *Miranda* rights when interviewed by law enforcement.

## BACKGROUND[1]

On June 1, 2016, United States Customs and Border Protection ("CBP") officers discovered a white powdery substance concealed in a shipping container (the "Container") at the

---

[1] The facts are taken from the trial record. (*See* Transcript of Trial ("Tr.") from November 14, 2017 (on file with chambers) and November 15–17, 2017, ECF Nos. 71–73.) The parties' have stipulated that "the pertinent testimony and evidence, taken and admitted during the trial of this matter in November of 2017," constitutes "the entire record of the suppression hearing." (ECF No. 102.) The Court, therefore, accepts the trial testimony as the record of the

Red Hook Container Terminal in Brooklyn, New York (the "Terminal"). (*See* Tr. 32:8–33:16, 36:18–25.) The substance field-tested positive for cocaine. (*See id.* 37:1–23.) CBP then notified Homeland Security Investigations ("HSI"), placed an agricultural hold[2] on the Container to ensure that it would not be picked up while the inspection was ongoing, and confiscated the cocaine. (*Id.* 38:1–2, 43:7–44:4, 100:10–17.) Special Agent Lennis Barrois, the HSI officer leading the investigation, decided to attempt a controlled delivery of the Container. (*Id.* 100:18–101:10, 177:16–18.) The Container's contents, absent the drugs, were returned to the Container, and the Container was resealed. (*Id.* 52:8–53:19, 101:2–03, 177:13–24.) On June 6, 2016, agents were positioned in unmarked cars in and around the Terminal to conduct surveillance. (*Id.* 101:15–103:19, 156:6–157:1.) At some point that morning, the agricultural hold was lifted. (*Id.* 101:25–102:3, 184:11–15.) At around 8:30 a.m., a truck driver, later identified as Edwin Pacheco (Defendant's employer), arrived at the Terminal and attempted to retrieve the Container. (*Id.* 61:11–25, 64:11–69:23, 183:14–84:8.) Pacheco was given a document indicating that the Container could not be released until additional charges and fees were paid. (*Id.* 61:11–25, 64:11–69:23.) Pacheco then left without the Container. (*Id.* 103:14–22.)

On the morning of June 7, 2016, Defendant received a call from importer-exporter Jimmy Machuca asking him to pick up the Container. (*Id.* 486:1–8.) Defendant agreed that he would. (*Id.* 486:4–8, 490:13–14.) Defendant then spoke with Javier Montalvo, a work acquaintance, about picking up the Container for Machuca. (*Id.* 485:24–249:2.) According to Defendant, Montalvo told Defendant that Pacheco had previously gone to retrieve the Container but did not

---

suppression hearing. *See United States v. Mathurin*, 148 F.3d 68, 70 (2d Cir. 1998) ("The parties are free to stipulate to the use or incorporation of the pertinent trial testimony to constitute or supplement the record of the required hearing.").

[2] An agricultural hold is generally used to prevent removal of a container from a terminal until CBP can determine whether the cargo complies with United States safety standards. (Tr. 28:24–29:22, 100:14–17.)

ultimately retrieve it. (*Id.* 487:13–14, 429:1–21.) Defendant testified that Montalvo told him that Pacheco was angry and had said that "something about it smelled bad." (*Id.* 487:9–20, 549:7–21; *see also id.* 429:1–21.) Defendant also testified that Montalvo warned him to "be careful with Machuca because . . . it's kind of hard to get him to pay." (*Id.* 486:15–16, *see also* 429:22–25.) At 2:23 p.m., Defendant arrived at the Terminal to retrieve the Container. (*Id.* 62:4–63:19.) While at the Terminal, Defendant called Special Agent Ryan Dalrymple, an HSI officer with whom Defendant had previously interacted, to inquire whether there were any problems with the Container.[3] (*Id.* 123:23–124:10, 228:25–231:9.) Agent Dalrymple said that he would call Defendant back. (*Id.* 231:5–9, 243:5–17.) Without hearing back from Agent Dalrymple, Defendant left the Terminal with the Container at 2:47 p.m. (*Id.* 63:11–13, 244:8–14, 493:10–18.) Agents, including Agent Barrois, followed Defendant by car while simultaneously monitoring the Container via GPS tracker. (*Id.* 108:3–109:9.) Defendant ultimately arrived and deposited the Container at 674 Longfellow Avenue in the Bronx, where the agents stopped Defendant and arrested him. (*Id.* 108:7–19, 113:19–25, 163:11–23.)

After his arrest, Defendant was interviewed twice by law enforcement officers at the HSI office in Manhattan. (*Id.* 114:14–16.) Agent Barrois, Officer Corvi, Supervisory Agent Etienne, and Special Agent Maloney each participated in at least one of these interviews. (*Id.* 114:1–117:2, 165:17–21, 298:9–15, 305:4–12, 323:15–23.) Agent Barrois, Officer Corvi, Agent Etienne, and Defendant testified at trial.

---

[3] Defendant stated that he called Agent Dalrymple because he was suspicious based on what Montalvo had told him and because he saw what he believed could be a law enforcement vehicle at the Terminal. (Tr. 491:10–23, 497:5–13, 520:22–521:16, 532:5–7.) Defendant also testified that he told the agents, during his post-arrest interviews, that he was suspicious because the weight of the Container was not correct for coconuts. (*Id.* 531:16–532:4.) Defendant testified that Machuca had told him that the Container held coconuts, sour oranges, and peppers. (*Id.* 519:7–14.)

3

According to Agent Barrois, he and Officer Corvi conducted the first interview. (*Id.* 323:22–23, 114:4–5.) Agent Barrois began the interview by asking Defendant if he understood and spoke English. (*Id.* 114:8–9.) Defendant responded that he did. (*Id.*) Agent Barrois then read Defendant the *Miranda* warnings from a sheet of paper, which was consistent with his "standard practice." (*Id.* 114:9–10, 166:19–25, 167:3–23.) Defendant responded that he understood his rights, waived those rights, and then signed a written waiver form. (*Id.* 114:9–13, 167:11–23.) Agent Barrois also testified that he asked Defendant if the agents could search Defendant's phone. (*Id.* 120:6–13.) Defendant agreed and signed a Consent to Search Form. (*Id.* 120:12–13, 174:9–75:8.) The Consent to Search Form was introduced as Defendant's Exhibit D at trial. (*Id.* 174:2–17; Gov't Mem. L. Opp. Mot. Suppress ("Gov't Opp'n"), Ex. DX D, ECF No. 100-9.) The *Miranda* waiver form, however, was not introduced at trial, and Agent Barrois testified that it been misplaced. (*Id.* 114:9–13, 173:18–22, 325:13–17.) Agent Barrois took notes of the first interview, which were admitted at trial as Government's Exhibit 3500-LB-1. (*Id.* 181:13–22; Def.'s Mem., Ex. A at 1–2, ECF No. 99-2.) Sometime after the conclusion of the first interview, Agent Etienne informed Agent Barrois that Defendant wanted to make another statement. (*Id.* 116:19–117:2, 198:18–23.) According to Agent Barrois, he returned to the interview room, where Defendant then made inculpatory statements, specifically that he knew there were drugs in the Container and that he had previously picked up two containers containing narcotics in Pennsylvania for an individual named Lenin. (*Id.* 117:5–119:1.) Defendant also identified an individual named Tyrone as someone who "facilitates drugs." (*Id.* 119:4–11.) With respect to the *Miranda* warnings, Agent Barrois testified that sometime during the second interview, he reminded Defendant of his *Miranda* rights. (*Id.* 192:20–21.) Agent Barrois testified that Defendant again indicated that he understood them and waived them. (*Id.*)

4

Officer Corvi's testimony corroborated that of Agent Barrois'. Specifically, Officer Corvi testified that during the first interview Defendant told the agents that he understood English. (*Id.* 324:15–325:5.) Officer Corvi further testified that during that interview, Agent Barrois read Defendant his *Miranda* warnings "from a document" and that Defendant waived his *Miranda* rights and agreed to speak with the agents. (*Id.* 324:7–325:12.) As to the waiver form, Officer Corvi testified that he believed that he and Agent Barrois had asked Defendant to sign that form, but that he had not seen the form since the interview. (*Id.* 325:13–17.) Officer Corvi described the first interview as "mild" and testified that Defendant stated that he did not know there were drugs in the Container. (*Id.* 325:25–326:18.) Defendant was then placed in a holding cell until he asked for a second interview. (*Id.* 191:6–8, 305:13–19, 326:25–327:2, 505:10–12, 532:21–25.) Officer Corvi testified that during the second interview, Defendant stated that (i) he had understood Montalvo's warning to mean that there were narcotics inside of the Container and (ii) he had previously driven to Philadelphia and picked up two containers that he knew had contained narcotics for an individual named Lenin. (*Id.* 305:20–306:1, 306:22–307:8, 330:24–331:4, 334:9–22, 336:18–23.) Agent Corvi took notes of the second interview, which were admitted at trial as Government Exhibit 3500-MC-1. (*Id.* 307:18–25, 328:8–13; Def.'s Mem., Ex. A at 3–4, ECF No. 99-2.)

Agent Etienne was the final witness to testify concerning the *Miranda* warnings. Specifically, he testified that, after the first interview ended, either Agent Barrois or Officer Corvi reported to him that Defendant had waived his *Miranda* rights, "but didn't say much." (*Id.* 380:7–381:7.) Sometime thereafter, Agent Etienne went to check on Defendant. (*Id.* 354:3–24, 379:20–23.) At that time, Defendant stated that he wanted to talk. (*Id.* 354:25–355:4, 505:13–25.) Agent Etienne, Officer Corvi, and Agent Malone then interviewed Defendant a second

time. (*Id.* 327:3–21 355:6–12.) Agent Etienne's testimony corroborated Officer Corvi's. Agent Etienne testified that during this second interview, Defendant made inculpatory statements, specifically that in speaking with Montalvo, Defendant knew there were drugs in the container and that Defendant had previously transported two containers with drugs for someone named Lenin. (*Id.* 359:18–20, 362:22–365:20.) Agent Etienne also testified that Defendant told the officers about someone named "Tyrone" who imports drugs. (*Id.* 365:13–17.) At some point, Agent Barrois joined the second interview. (328:20–23, 397:8–12.) Agent Etienne testified that he directed Defendant to repeat his statement to Agent Barrois. (*Id.* 365:17–366:5.) Agent Etienne then left the room. (*Id.* 366:6.)

      According to Defendant, after his arrest, he was taken to an office in Manhattan and questioned by agents. (*Id.* 501:16–24.) Defendant corroborated that he gave his consent to proceed in English and consented to the search of his phone. (*Id.* 501:23–502:1, 502:21–503:3.) Defendant's consent to search the phone was memorialized in a Consent to Search form signed by Defendant. (*Id.* 502:21–503:3.) Defendant also corroborated that he requested a second interview and told Agent Etienne that he wanted to "talk about everything that [he] knew." (*Id.* 505:13–25.) That said, Defendant maintained that he was not provided *Miranda* warnings prior to his first or second interview. (*Id.* 502:2–20, 506:24–507:1.) He further maintained that at no point during either interview did he tell the agents that he knew that there were drugs in the Container. (*Id.* 504:20–22, 505:1–7, 507:9–12, 508:8–11.) Indeed, Defendant testified at trial that he did not know, prior to picking up the Container, that it contained drugs. (*Id.* 497:2–4, 529:9–11, 531:21–25.) With respect to what he told the agents about Lenin and Tyrone, Defendant testified that he identified Tyrone because the agents had asked him for names of fruit importers or "people he knew." (*Id.* 511:9–14, 537:3–539:12.) Defendant denied saying that

6

Tyrone was a drug importer. (*Id.* 511:15–20, 538:14–539:12.) Defendant admitted that he told the agents about two specific containers he had transported for Lenin in Pennsylvania but denied ever saying that the containers held drugs. (*Id.* 510:5–13; 554:22–555:1.) Defendant suggested at trial that the agents could not understand him well during the second interview. (*Id.* 557:20–558:6.)

At some point between June 7, 2016 and July 8, 2016, Agent Barrois completed a Report of Investigation ("ROI") summarizing both interviews. (*Id.* 197:22–199:6.) The ROI states that "[a]fter being read his *Miranda* warnings, [Defendant] understood, signed and waived his *Miranda* rights and agreed to talked [sic] to law enforcement." (Gov't Opp'n, Ex. GX 3500-LB-12 at 1, ECF No. 100-8.) The report also states that Defendant "agreed and gave consent to search his phone." (*Id.*) The ROI reflects that Defendant was placed in a detention cell following the first interview and that soon thereafter, he initiated contact with Agent Etienne and Officer Corvi. (*Id.* at 2.) According to the ROI, Defendant admitted during the second interview that once Montalvo cautioned Defendant to "be careful," Defendant knew there were narcotics in the Container. (*Id.*) The ROI further reflects that Defendant stated during the second interview that he had previously transported two containers containing narcotics for an individual named Lenin, and that he had heard that an individual named Tyrone imported narcotics. (*Id.*)

## DISCUSSION

Prior to any custodial interrogation, a defendant must be informed of his Fifth Amendment rights as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966). The government must show by a "preponderance of the evidence" that the defendant knowingly and voluntarily waived those rights. *United States v. Gonzalez*, 764 F.3d 159, 166 (2d Cir. 2014); *see also Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (holding that defendant's *Miranda* waiver was

knowing and voluntary). Notably, witnesses' consistent, detailed, and credible testimony that a defendant received *Miranda* warnings and waived them, despite the defendant's testimony to the contrary, is sufficient to deny a defendant's motion to suppress his statements. *See United States v. Alequin*, 792 F. App'x 859, 862 (2d Cir. 2019) (summary order) (affirming a district court's denial of a motion to suppress where "the district court found both [the arresting officer and a codefendant] credible based on their demeanor, their consistency, and the detailed nature of their testimony, and found [the defendant's] testimony that he never received his *Miranda* rights to be less credible in comparison.").

Here, the testimony from each law enforcement officer regarding the *Miranda* warnings is credible and consistent. Agent Barrois and Officer Corvi each testified that, during the first interview, Agent Barrois asked Defendant if he was able to speak and understand English. (Tr. 114:8–9, 324:15–325:5.) Defendant responded that he could and agreed to speak with them in English. (*Id.*) Both Agent Barrios and Officer Corvi, each with substantial law enforcement experience and experience in administering *Miranda* warnings (*id.* 94:3–25, 167:3–5, 309:12–310:7), testified that, prior to questioning Defendant, Agent Barrois read Defendant his *Miranda* rights and that Defendant waived those rights. (*See* Tr. 114:8–13, 166:19-167:23, 325:2–15.) A third witness, Agent Etienne, testified that, shortly after the first interview, either Agent Barrois or Officer Corvi reported to him that Defendant waived his *Miranda* rights. (*Id.* 380:7–381:7.) Specifically, Agent Etienne testified that, after the first interview, either Agent Barrois or Officer Corvi informed him that Defendant "waived but didn't say much." (*Id.* 380:24–381:9.) This is consistent with Agent Barrois' and Officer Corvi's testimony that Defendant waived his *Miranda* rights, and with their description of the initial interview. Agent Barrois also testified that Defendant signed a consent form permitting law enforcement to search his phone. (*Id.* 174:2–

175:10.) The Report of Investigation, authored within a month of the interviews, states that Defendant was read and waived his *Miranda* rights, and that he consented to the agents searching his phone. (Gov't Opp'n, Ex. GX 3500-LB-12 at 1.) Notably, Defendant concedes that he agreed to speak with the agents in English and that he agreed to a search of his phone. (Tr. 501:25–503:16.) Defendant's bare denials that he was not read his rights, that he did not waive his rights, and that he did not execute a *Miranda* waiver form (*id.* 502:7–20, 506:24–07:1, 530:11–13) are outweighed by the clear, consistent, and credible testimony of the agents. And, Defendant's arguments do not persuade the Court to find otherwise.

*First,* Defendant argues that the absence of the signed *Miranda* waiver form undercuts the agents' credibility. (Def.'s Mem. L. Sup. Mot. Suppress ("Def.'s Mem.") 6, ECF No. 99-1.) However, a signed written *Miranda* waiver form is not legally required. *See United States v. Martinez*, 992 F. Supp. 2d 322, 334 (S.D.N.Y. 2014) (finding the Government met its burden of proving a valid *Miranda* waiver where no waiver form was signed). Even where such a form was signed, but then lost, the Court may still find that the agent's testimony regarding waiver is credible. *See United States v. Ocasio*, No. 10-CR-6096-FPG, 2013 WL 3288293, at *6 (W.D.N.Y. June 28, 2013) ("While it is unfortunate that the rights card has been lost, there is nothing in the record to suggest that the Investigators' testimony lacks credibility."); *United States v. Everett*, 40 F. Supp. 2d 539, 541 (D. Vt. 1999) (finding the defendant knowingly and voluntarily waived his *Miranda* rights, even though the detective "lost the initial *Miranda* card that [the defendant] had signed"). Certainly, had the Government adduced a copy of the executed waiver form, the issues presented here would be easily resolved. However, even documents as important as signed *Miranda* waivers are from time to time misplaced. *See, e.g.*, *United States v. Denny*, 221 F.3d 1349 (9th Cir. 2000) (unpublished) (denying defendant's

argument to suppress and noting that "[a]lthough the police lost the written *Miranda* waiver form executed by [defendant], the district court credited the testimony of [i]nvestigators . . . that [defendant] was advised of his *Miranda* rights."), *cert denied Denny v. United States*, 531 U.S. 907 (2000); *United States v. Oriedo*, No. 03-CR-40050-JLF, 2006 WL 335584, at *4 (S.D. Ill. Feb. 13, 2006) ("Despite the lost *Miranda* waiver form, the Court finds that based on the evidence produced at the hearing, defendant was advised of his *Miranda* warnings, and he voluntarily agreed to waive them."). That fact alone is not necessarily dispositive where the Court finds the officers' testimony credible, as it does here.

Here, the Court credits the testimony of agents Barrois and Corvi that Defendant was given his *Miranda* warnings and that he waived his rights. Agent Etienne's testimony that he was immediately informed of Defendant's waiver is likewise credible. These determinations provide sufficient basis to deny the motion to suppress.[4] *United States v. Brooks*, No. 16-CR-6028L, 2016 WL 7409852, at *10 (W.D.N.Y. Dec. 22, 2016), *report and recommendation adopted*, No. 16-CR-6028L, 2017 WL 370810 (W.D.N.Y. Jan. 26, 2017) (denying motion to suppress defendant's post-arrest statements and finding waiver valid where officer verbally advised defendant of his *Miranda* rights from memory); *see also United States v. Medina*, 19 F. Supp. 3d 518, 540 (S.D.N.Y. 2014) ("Written confirmation of a verbal waiver is, of course, not required." (citations omitted)).

In an effort to avoid such a finding, Defendant urges the Court to consider the Government's failure to produce the signed waiver form as evidence that the waiver form did not exist. (Def.'s Mem. at 7.) To support this notion, Defendant points to the fact that Agent

---

[4] Although not necessary to the Court's finding, the Court further credits the testimony by Agent Barrois that he provided Defendant with the waiver form and that Defendant signed that form. The ROI corroborates that Defendant "signed" and waived his *Miranda* rights. (Gov't Opp'n, Ex. GX 3500-LB-12 at 1.)

Etienne did not recall seeing a signed waiver form. (*Id.* at 8.) However, there is no testimony or other evidence suggesting that Agent Etienne would have been expected to review such a form. Nonetheless, without authority, Defendant argues that the absence of the waiver form, together with Defendant's testimony that he was never informed of his rights, is sufficient to find that the Government has not met its burden of establishing that Defendant was properly advised of his rights. (*Id.* at 7.) This would be so only if the Court found that the agents' testimony was incredible. It does not.[5]

*Second,* Defendant argues that the Court should construe the agents' failure to record the interview as evidence that *Miranda* warnings were not given. (*Id.* at 7.) However, Defendant has not identified any legal requirement in existence at the time of Defendant's arrest that an interview be recorded. *See United States v. Choudhry*, 24 F. Supp. 3d 273, 276 (E.D.N.Y. 2014) (denying a motion to suppress post-arrest statements where "[t]he session was not recorded."), *aff'd*, 649 F. App'x 60 (2d Cir. 2016); *United States v. Guobadia*, No. 16-CR-6036-EAW-JWF, 2018 WL 8620477, at *6 (W.D.N.Y. Aug. 27, 2018) ("[V]ideo evidence confirming the advisement of *Miranda* warnings is not required for the government to establish that [plaintiff] was advised of his *Miranda* rights and properly waived those rights."), *report and recommendation adopted*, No. 6:16-CR-06036 EAW, 2019 WL 1593922, at *2 (W.D.N.Y. Apr. 15, 2019). Indeed, Agent Barrois and Agent Etienne both testified that at the time of Defendant's interviews, it was not HSI policy to record interviews and HSI agents had not yet been issued equipment to do so.[6] (Tr. 179:2–181:12, 206:13–18, 375:8–376:3.) According to

---

[5] Defendant further argues that the agents' failure to preserve the signed *Miranda* waiver is "even more suspicious when coupled with the fact that the agents successfully preserved a consent to search form signed by Defendant." (Def.'s Mem. at 6.) Defendant's argument assumes that items are lost in pairs or in some organized fashion. The Court does not make the same assumption.

[6] According to Agent Barrois, he did not even receive training on recording interviews until after the events at issue here. (Tr. 181:5–12.)

11

testimony, all that was required under agency policy is that Defendant was read his rights in the presence of two agents. (*Id.* 370:3–21.) That policy was followed.[7] Agent Barrois and Officer Corvi were both present during the first interview, and both testified consistently that Defendant was read and waived his rights.[8]

*Third*, Defendant directs the Court to the contemporaneous notes taken by the agents during each interview as evidence that the *Miranda* warnings were not issued. (Def.'s Mem. at 7–8.) As Defendant's argument goes, because these notes do not mention that Defendant was given his *Miranda* rights, they fail to corroborate Agent Barrois' and Officer Corvi's testimony. (*Id.* at 8.) This is true. But the agents' testimony does not necessarily require further corroboration. This is not unlike *United States v. Adams*. In *United States v. Adams*, the court credited agents' testimony that defendant had been read all but the last line of his *Miranda* rights, even where the officer's field report did not make any mention of the administration of *Miranda* warnings. No. 92 CRIM. 375 (LBS), 1992 WL 275596, at *3 (S.D.N.Y. Sept. 25, 1992). The court reasoned that "[t]he nature of the report is such that matters of routine procedure may well have been inadvertently omitted." *Id*. Such appears to be the case here. This conclusion is further buttressed by the fact that the notes do not contain reference to the fact that he consented

---

[7] The Second Circuit observed that Agent Barrois could have recorded the interview on his cell phone. *United States v. Solano*, 966 F.3d 184, 189 (2d Cir. 2020). However, the Court does not view his decision not to do so as a basis to discount his credibility as to whether the *Miranda* warnings were given, particularly in light of the policies and practices in effect at the time. (Tr. 206:13–18 (Agent Barrois testified that it was not standard HSI practice at the time to use personal devices to record interviews or to video record defendants' statements), 375:8–76:3 (Agent Etienne testified that it was not agency policy at the time to record interviews and that agency offices received recording equipment sometime thereafter).

[8] Agent Barrois also testified that he reminded Defendant of his rights during the second interview. (Tr. 192:18–21.) Although Agent Etienne, Officer Corvi, and at least one other agent were also present at the second interview, they did not testify one way or the other on this point. In any event, the initial warning was sufficient. *Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) ("The fact that [defendant] made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to rewarn suspects from time to time."); *United States v. Eltayib*, 88 F.3d 157, 169 (2d Cir. 1996) (rejecting defendant's argument that valid *Miranda* warnings given earlier in the evening had dissipated by the time defendant made his statements).

to the search of his phone or that he signed the Consent to Search form, neither of which is disputed.

*Fourth*, Defendant argues that Agent Barrois' testimony that he reminded Defendant of his rights during the second interview is contradicted by Agent Etienne's testimony that he never saw Defendant receive *Miranda* warnings. (Def.'s Mem. at 8.) Defendant's argument proves too much. Agent Etienne testified that after he brought Agent Barrois into the second interview and told Defendant to repeat his story to Agent Barrois, Agent Etienne left the room. (Tr. 398:3–6.) Based on the record, Agent Etienne left the room after he instructed Defendant to repeat his statement to Agent Barrois. In other words, he very well may not have been present during the time in which Agent Barrois gave the reminder. While Agent Barrios testified that he reminded Defendant of his warnings during the second interview, the record, at best, does not make clear one way or the other whether Agent Etienne was purportedly in the room at the time the reminder was given. Officer Corvi did not testify at all concerning the purported reminder. While it is true that Agent Barrois' testimony as to the *Miranda* reminder is not corroborated by the other agents' testimony, it is also not contradicted by it. Thus, Agent Barrois' testimony that he reminded Defendant of his rights is contradicted only by Defendant's own statement that he was not read his rights during the second interview.

The Court acknowledges that the Second Circuit determined that there were credibility issues at trial. In particular, the Second Circuit identified "serious" credibility issues regarding Defendant's "denial that he had known there were drugs in the Container and the credibility of his denial that he ever said that he did have that knowledge, as against the credibility of the officer witnesses' undocumented testimony that [Defendant] admitted such knowledge." *Solano*,

13

966 F.3d at 199–201.[9]  However, on this motion, the Court is tasked with determining whether Defendant received his *Miranda* warnings and waived his rights, which the parties admit was not the subject of the Second Circuit's discussion.  (Def.'s Mem. at 8 (citing *Solano*, 966 F.3d at 199–200.)  As the finder of fact on the instant motion, the district court is permitted to make its own findings regarding witness credibility.  *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009) (citations omitted) ("The assessment of witness credibility lies solely within the province of the [fact finder], and the [factfinder] is free to believe part and disbelieve part of any witness's testimony[.]").  Even if the Court were to find the law enforcement officers' testimony on Defendant's knowledge incredible in whole or in part, the Court is not precluded from crediting the agents' testimony on the question of whether Defendant was read and waived his *Miranda* rights.

> [T]he district judge as factfinder has considerable discretion in resolving evidentiary inconsistencies. Inconsistency may prompt a factfinder to reject both versions of an account, or to accept one over the other based on a finding that one witness's recollection is more reliable or credible than the other. Moreover, a factfinder who determines that a witness has been "inaccurate, contradictory and even untruthful in some respects" may nevertheless find the witness "entirely credible in the essentials of his testimony."

*United States v. Delacruz*, 862 F.3d 163, 176 (2d Cir. 2017) (citations omitted).  A district court, like a jury, may very well credit the witnesses differently on different issues.  *United States v. Chisholm*, No. 07-CR-795NGGMDG, 2009 WL 29313, at *2 (E.D.N.Y. Jan. 5, 2009) ("Even when an aspect of a witness's testimony gives the court pause, a court may still find such a witness credible and credit his testimony." (citation omitted)); *United States v. Gomez*, 877 F.3d

---

[9] In particular, the Second Circuit determined that there was "considerable circumstantial evidence in the record to support both [Defendant's] testimony that he did not know the Container contained drugs and his testimony that he did not tell the officer witnesses that [knew]," such that Defendant's testimony on these points was "certainly plausible." *Solano*, 966 F.3d at 198.  The Second Circuit indicated that this could outweigh the agents' testimony on the issue of Defendant's knowledge, particularly in light of the agents' failure to contemporaneously document Defendant's admissions despite Agent Etienne's testimony that he asked Defendant to repeat his inculpatory statements "expressly for the purpose of making sure everything was documented properly." *Id.* at 199 (internal quotation marks and citation omitted).

14

76, 97 (2d Cir. 2017) ("[A] factfinder who determines that a witness has been contradictory in some respects may nevertheless find the witness entirely credible in the essentials of his testimony." (internal quotation marks and citation omitted)). In *United States v. Chisholm*, for example, the court credited the testimony of a defendant's witness over the testimony of law enforcement officers regarding an initial search and arrest but credited those same officers' testimony regarding subsequent events. 2009 WL 29313, at *2. The court noted that the officers had appeared truthful but their testimony about the initial search and arrest conflicted with the facts set forth in the complaint, another officer's testimony, and the government's description of the facts. *Id.*

Here, for the reasons set forth above, the Court credits the officers' testimony that Defendant was read and waived his *Miranda* rights. Certainly, there remain other factual disputes, including the issues surrounding whether Defendant knew that there were drugs in the Container. The Court recognizes that the Second Circuit determined that Defendant's testimony regarding his knowledge was "certainly plausible." *Solano*, 966 F.3d at 198. It will ultimately be up to a jury to determine whether to credit Defendant's testimony on that topic. *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("Where there are conflicts in the testimony . . . t the weight of the evidence and the credibility of the witnesses" are issues for the jury); (*see also* Jury Charge, *United States v. Solano*, No. 16-cr-535 (Nov. 17, 2017) at Tr. 664:1–5 ("You alone pass upon the weight of the evidence. You determine the credibility of witnesses. You resolve such conflicts as there may be in the testimony. And you draw whatever reasonable inferences you decide to draw from the facts as you have determined them.")).

## CONCLUSION

Having determined that the agents' testimony regarding the provision of *Miranda* warnings is credible, Defendant's suppression motion is DENIED.

                                            SO ORDERED.

Dated: Brooklyn, New York            /s/ LDH
       September 16, 2021            L<small>A</small>SHANN D<small>E</small>ARCY HALL
                                        United States District Judge